# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CHERYL SAWYERS,
    Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-0025

Spiegel, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement of

Errors (Doc. 8), the Commissioner's response in opposition (Doc. 14), and plaintiff's reply

memorandum. (Doc. 15).

## I. Procedural Background

Plaintiff filed an application for DIB in June 2007, alleging disability since July 4, 2006,

due to a herniated disc in the neck, pain in the right shoulder and hands, depression, bulging discs

in the lower back, and headaches. Plaintiff's application was denied initially and upon

reconsideration. Plaintiff, through counsel, requested and was granted a de novo hearing before

ALJ Paul Yerian. Plaintiff and a vocational expert (VE) appeared and testified at the ALJ

hearing. On February 26, 2010, the ALJ issued a decision denying plaintiff's DIB application.

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ

the final administrative decision of the Commissioner.

## II. Medical Evidence

### A. Physical Impairments

Plaintiff sustained a work-related injury to her neck, back and right shoulder on the alleged onset date while working as a home health aide. Dr. Phillip Goldman, M.D., referred plaintiff for several MRIs. (Tr. 416-19). A June 2006 MRI of her lumbar spine showed annular tears at L4-5 and L5-S1 and associated central L5-S1 intraanular protrusion without evidence of frank extrusion and no other sites of lumbar disc herniation or compression. (Tr. 418). An August 2006 MRI of the cervical spine showed tiny central disc displacement or disc protrusion with ventral cord abutment at C5-C6 and minimal left neural foraminal narrowing at the C3-C4 level secondary to minimal joint hypertrophic change. (Tr. 416-17). An MRI of the right shoulder obtained in September 2006 revealed some findings of mild severity. (Tr. 419).

Plaintiff received treatment for her work-related injury at the Back & Spine Center of West Chester beginning in late 2006. (Tr. 301-415, 560-592). She was treated by Dr. Stephen Choi regularly from 2007-2008 (Tr. 302-59, 374-76, 385-87, 397-402, 584-92, 626-28) and by Dr. Hungchih Lee, M.D., in 2009 after Dr. Choi left the practice. (Tr. 560-580, 623-625, 629-634). Both doctors prescribed medication for plaintiff, including Oxycontin, Oxycodone, Baclofen, Soma, Celebrex, Robaxin, Neurontin, Zofran (anti-nausea drug), Lyrica, Sonata, and Valium (Tr. 304, 309, 312, 315, 318, 321, 324, 327, 330, 333, 336, 339, 346, 349, 352, 359, 562, 565, 568, 574, 577, 583, 586, 589, 592). Plaintiff also underwent chiropractic treatment with Dr. Aaron Troy Schrickel, C.C.I.C., A.B.D.A., from December 2006 to February 2007. (Tr. 360-73, 377-84, 388-96, 403-15). In addition, plaintiff received several epidural steroid injections from

Dr. Thomas Knox on January 21, 2009; February 25, 2009; March 11, 2009; April 8, 2009; and November 11, 2009. (Tr. 439-50; 521-59; 605-12).

Dr. Choi wrote a letter dated October 16, 2007, with respect to the status of plaintiff's workers compensation claim. (Tr. 296). Dr. Choi stated that he had continued to see plaintiff for medication management purposes as she remained "quite symptomatic both with respect to her low back and with respect to her neck." (Id.). He recommended either epidural steroid injections if coverage could be obtained or, if those were unavailing, a surgical consultation. Dr. Choi opined that plaintiff remained temporarily totally disabled due to the combined effect of her lumbar disc and cervical disc problems; she had been incapable of engaging in any competitive work activity, including sedentary work, while under his care; and he questioned whether she would ever be able to return to gainful employment due to her ongoing neck and back problems.

Consultative examining physician Dr. Phillip Swedberg, M.D., issued a report dated October 2, 2007. (Tr. 242-48). He listed plaintiff's height as 5' 3" and her weight as 283 lbs. He described plaintiff as a massively obese woman who ambulated with a normal gait without the use of ambulatory aids and who was comfortable in both the sitting and supine positions. Range of motion tests were normal except for decreased range of motion of the cervical spine. There was no evidence of paravertebral muscle spasm, tenderness, muscle weakness or atrophy, and all sensory modalities were well-preserved. An x-ray of the lumbar spine taken the date of the exam was normal. (Tr. 249). Dr. Swedberg diagnosed plaintiff with morbid obesity and chronic neck pain. He found that other than decreased range of motion of the cervical spine, her physical examination was "entirely normal." (Tr. 244). He opined that obesity did not contribute to her symptoms, although weight reduction would be beneficial. Dr. Swedberg concluded that

3

plaintiff appeared capable of performing "at least a moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects." (*Id.*). He opined that plaintiff "has no difficulty reaching, grasping and handling objects." (*Id.*).

State agency physician Dr. Charles Derrow, M.D., reviewed the medical record and issued a physical RFC assessment dated October 25, 2007. (Tr. 270-77). Dr. Derrow opined that plaintiff could occasionally lift/carry 50 pounds; she could stand/walk about 6 hours in an 8-hour workday; and she could sit about 6 hours in an 8-hour workday. Her ability to push/pull was unlimited. She could occasionally stoop. As support for his findings, Dr. Derrow relied upon the findings of the consultative examining physician that plaintiff's range of motion of the cervical spine was reduced by half; the lumbar spine was normal; range of motion in all other joints was normal; muscle and grasp were well-preserved over the upper extremities as was pinprick and light touch; manipulative ability was normal bilaterally; plaintiff had a normal gait without ambulatory aids; obesity did not contribute to her symptoms; and other than decreased cervical range of motion, the consultative exam was entirely normal. (Tr. 271).

Plaintiff's primary care physician, Dr. Ashok Kejriwal, M.D., completed a disability questionnaire at the request of plaintiff's counsel on January 18, 2007. (Tr. 292-93). Dr. Kejriwal indicated that he had been seeing plaintiff for two years. Dr. Kejriwal diagnosed low back pain, neck pain, bilateral arm pain due to neck pain, "overweight," headaches, diabetes, hyperlipedemia, urinary incontinence, anxiety and depression, and possible bipolar disorder. Dr. Kejriwal opined that plaintiff was capable of sitting a total of 1 to 3 hours in an 8-hour day; she was capable of standing 1 to 2 hours total in an 8-hour day; she could never bend, squat, crawl or climb; she could occasionally reach; she could frequently lift/carry 5 pounds and occasionally

4

lift/carry 10 pounds; she could not use her hands for fine manipulation or pushing/pulling of arm controls; and she could not use her feet for the repetitive operation of leg controls.

Dr. Kejriwal submitted a supplemental report dated May 8, 2009, at the request of plaintiff's attorney. (Tr. 452-455). He reported that he had continued to follow plaintiff for the same conditions he had previously identified. He checked boxes indicating that plaintiff had on a consistent basis exhibited signs and symptoms of severe intractable back and neck pain; that plaintiff's obesity was a complicating and/or contributing factor in terms of her musculoskeletal problems, and particularly her low back problems; that his opinions as to plaintiff's functional limitations remained unchanged; and that plaintiff had shown no signs of deliberate exaggeration or malingering while under his care.

An MRI of the lumbar spine obtained at the request of Dr. Lee on August 26, 2009, showed: (1) broad based noncompressive disc protrusion at L5-S1 accompanied by degenerative facet arthropathy, resulting in mild biforaminal stenosis, with co-existing facet joint capsulosynovitis, left greater than the right; and (2) a shallow noncompressive disc bulge at L4-5 without appreciable interval change, and degenerative facet arthropathy without substantive foraminal stenosis. (Tr. 594). Dr. Arthur Arrand, M.D., a neurosurgeon, reviewed the MRI at Dr. Lee's request. Dr. Arrand opined that the MRI showed lumbar degenerative disc disease but there was "no surgical pathology on the MRI," and he therefore recommended an evaluation for consideration of a spinal cord stimulator implantation. (Tr. 621).

Dr. Lee wrote a letter dated January 8, 2010, in which he stated that plaintiff had been under his and Dr. Choi's care since December 2006. (Tr. 633-34). He wrote that she remained "quite symptomatic" with respect to her low back and neck, with the low back pain radiating into

5

the left leg and groin, and she required treatment for both areas. (Tr. 633). He opined the June 2006 lumbar MRI revealed significant degenerative disc disease at L4-5 and L5-S1 with disc protrusion at L5-S1, a bulge at L4-5, and multilevel facet arthropathy. Dr. Lee noted plaintiff had neck complaints of chronic pain and headaches. He reported that the August 2006 cervical MRI showed degenerative disc disease at C5-6 with displacement and ventral cord abutment and "C3-4 with degenerative joint disease/arthropathy." (Id.). He noted that she was currently undergoing cervical and lumbar epidural injections. Dr. Lee opined that plaintiff is obese and back pain contributes to her obesity due to lack of activity. He opined that plaintiff is unable to sit or stand for extended periods of time due to her spinal conditions; she would not be capable of getting through an 8-hour workday even by alternating between sitting and standing; she would need to lie down off and on for pain relief; and she was currently on pain medications to control her pain level. Dr. Lee concluded that in his opinion, plaintiff is unable to engage in any gainful employment as the result of the combined effect of her cervical and lumbar conditions, and she has been incapable of any level of sustained competitive work activity, including sedentary, during the time she has been under his care.

Dr. Martin Fritzhand, M.D., examined plaintiff at the request of counsel on November 17, 2008. (Tr. 434-38). He noted that plaintiff was a massively obese woman who ambulated with a slow, limping antalgic gait while leaning on a cane. In his opinion, plaintiff appeared incapable of ambulating without a cane for any meaningful period of time or for any meaningful distance. Dr. Fritzhand noted that plaintiff was comfortable in both the sitting and supine positions. He diagnosed plaintiff with chronic low back pain secondary to degenerative joint disease of the lumbar spine; chronic neck pain secondary to degenerative joint disease of the cervical spine;

6

chronic pain syndrome; Type II diabetes mellitus; history of polysubstance abuse; and morbid obesity. Dr. Fritzhand summarized his examination findings by noting that plaintiff has a profound gait disturbance. She had difficulty forward bending at the waist and range of motion studies were diminished. There were no joint abnormalities, and grasp strength and manipulative ability were well-preserved bilaterally. He opined that plaintiff's obesity contributed to her symptoms. Dr. Fritzhand opined that plaintiff appeared "incapable of performing even a mild amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects." (Tr. 438). Dr. Fritzhand concluded that plaintiff appeared "markedly impaired to the extent that she is incapable of performing remunerative employment. The patient appears to have a severe functional impairment." (*Id.*).

### B. Mental Impairments

Plaintiff received psychiatric treatment from Dr. Gerald Shubs, M.D., at Butler Behavioral Health Services, Inc., beginning in October 2006. The medical record contains treatment records from Dr. Shubs through December 2009. (Tr. 421-433, 595-603, 614-16). Dr. Shubs wrote a letter dated September 19, 2007, stating that plaintiff had been under his psychiatric care since October 25, 2006, for chronic major depression; attention deficit/hyperactivity disorder (inattentive type); and chronic difficulties coping with her feelings. (Tr. 421). He wrote that she had been diagnosed with a schizoaffective disorder during a psychiatric hospitalization in October 2006, although part of the problem may have been the use of a variety of illicit drugs, which had since stopped. Dr. Shubs opined that plaintiff had no ability to handle stress well without becoming very anxious and her moods can cycle rapidly during stress and be unstable. He wrote that plaintiff can become impulsive and self-destructive.

7

He indicated that plaintiff was on Seroquel (an antipsychotic and mood stabililzer), Adderall, and Effexor, an antidepressant. Dr. Shubbs opined that plaintiff's stress intolerance, volatile mood, impulsivity, chronic pain, and difficulty coping with people make her unemployable, and that while her symptoms can come and go and be controlled by medication, they are permanent.

Dr. Shubs completed another assessment dated April 7, 2010, at the request of plaintiff's attorney. (Tr. 618-19). He indicated that plaintiff had been treated at his facility on a regular basis over the course of the preceding two years and she had been forthright in her complaints. He rated her as follows in various work-related areas of mental functioning, depending upon her level of pain and stress: Her ability to follow work rules was good; her ability to use judgment and to function independently was fair; her ability to relate to co-workers, deal with the public, and maintain attention and concentration was poor; and she had no ability to interact with supervisors and persist at work-like tasks.

Consultative examining psychologist Dr. Stephen P. Fritsch, Psy.D., performed a psychological evaluation of plaintiff at the request of the state agency on September 21, 2007. (Tr. 236-239). Plaintiff reported that she had two psychiatric hospitalizations following a "nervous breakdown" in 2000. Plaintiff's mood during the mental status exam was "quite distraught and emotionally reactive." (Tr. 237). She described pervasive symptoms of depression but denied suicidal ideation, angry outbursts, or other problems with emotional/behavioral control. Her presentation was lethargic and dysphoric. She was preoccupied with her medical condition but there were no indications of underlying delusional content. It was evident during the interview that stress and/or depression affected plaintiff's cognitive efficiency.

8

Dr. Fritsch diagnosed plaintiff as suffering from pain disorder associated with both psychological factors and her medical condition, and from recurrent, moderate major depressive disorder. He assigned her a GAF score of 52.[1] Dr. Fritsch opined that plaintiff is able to understand and remember short, simple instructions and would have no difficulty carrying out such instructions; she has moderate to marked impairment regarding her ability to maintain optimal concentration and persistence in the workplace as she is distracted by pain and cognitive inefficiency related to secondary depression; her ability to remember and carry out detailed instructions is markedly impaired and her ability to remember and carry out complex instructions is extremely impaired; her ability to interact with the public, supervisors, and coworkers is not impaired; her ability to respond appropriately to work pressures is markedly impaired; and her ability to respond appropriately to changes in work routines is moderately impaired.

State agency psychologist Dr. Patricia Semmelman completed a "Psychiatric Review Technique" and a Mental RFC Assessment on October 17, 2007. (Tr. 251-267). In the Psychiatric Review Technique, Dr. Semmelman opined that plaintiff would have mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration. (Tr. 261). In the Mental RFC Assessment, Dr. Semmelman opined that plaintiff would be moderately limited in her abilities to understand and remember detailed

---

[1] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 51-60 as having "moderate" symptoms. *Id.*

instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting. (Tr. 265-66). As support for her findings, Dr. Semmelman noted that the counselor who had followed plaintiff for the past year noted no problems with following directions. Dr. Semmelman further stated that plaintiff has some drug-seeking behavior, and she opined that plaintiff's complaints of concentration and attention issues could be attributed to such behavior. In addition, Dr. Semmelman relied on inconsistencies in plaintiff's appearance and behavior at various points in the record. Dr. Semmelman noted that although plaintiff presented at the consultative examination as preoccupied with her pain and unfocused, she did not present in this manner at the emergency room in June 2007 or in her phone call with "the adjudicator" in August 2007, and one did not get this impression from the counselor's report. (Tr. 267). Moreover, Dr. Semmelman found that while plaintiff presented as distraught and tearful to the consultative examiner, she did not present this way at the emergency room or to the counselor. Dr. Semmelman also noted that while plaintiff reported to the counselor she does not like to leave her home, she did not report this at the emergency room or to the consultative examiner; she has at least some friends and family with whom she interacts regularly; and her counselor noted her to be "upbeat and positive to more negative." (*Id*.). Dr. Semmelman found that plaintiff can interact occasionally and superficially; she can receive instructions and ask questions appropriately or in a smaller or

10

solitary and nonpublic work setting; and she can cope with ordinary and routine changes in a work setting that is not fast paced or highly demanding. Dr. Semmelman concluded plaintiff's presentation at the consultative examination was less than credible, and Dr. Semmelman therefore gave "lesser weight" to his conclusions. (Tr. 268).

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A) (DIB). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a)

(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the

sequential evaluation process. *Id.; Wilson* v. *Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir.

2004). Once the claimant establishes a prima facie case by showing an inability to perform the

relevant previous employment, the burden shifts to the Commissioner to show that the claimant

can perform other substantial gainful employment and that such employment exists in the

national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir.

1999).

## B.  The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The claimant met the special earnings requirement[s] of the Act on July 4, 2006, the date she said she became unable to work, and continued to meet those requirements through September 30, 2009.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of July 4, 2006 through her date last insured of September 30, 2009 (20 CFR 404.1571 et seq.).

3. Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the cervical and lumbar spines with disc protrusion at the C5-6 and L5-S1 levels; obesity; diabetes; degenerative changes in the right wrist; right shoulder tendinitis; depression; pain disorder with general medical condition and psychological factors (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the [ALJ] find[s] that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations: no more than occasional stooping; no more than superficial contact with others; no contact with the public; no rapid work-pace; no requirement to maintain attention and concentration for more than two hours at a time; and no strict time or production standards.

6. Through the date last insured, the claimant was capable of performing past relevant work as a staff coordinator. This work did not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from July 4, 2006, the alleged onset date, through September 30, 2009, the date last insured (20 CFR 404.1520(f)).

(Tr. 11-24).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In

13

deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004) (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ erred by failing to afford sufficient weight to the opinions of her treating physicians, including her primary care physician, Dr. Kejriwal; her treating pain management specialists, Dr. Choi and Dr. Lee; and her treating psychiatrist, Dr. Shubs; (2) the ALJ erred by failing to properly consider the effects of plaintiff's obesity in violation of Social Security Ruling 02-01p; (3) the ALJ erred by improperly substituting his opinion for that of plaintiff's treating physicians; (4) the ALJ erred by making selective references to the record to support a finding that plaintiff was not disabled; and (5) the ALJ erred by posing an improper hypothetical to the VE.

**1. The ALJ erred in weighing the opinions of plaintiff's treating physicians.**

Plaintiff contends the ALJ erred by failing to give sufficient weight to the opinions of her treating physicians, each of whom opined that plaintiff could not engage in competitive full-time employment.  In October 2007, Dr. Choi opined that plaintiff had been unable to engage in even sedentary work activity while under his care, and he found it unlikely that plaintiff would be able to return to gainful employment in the foreseeable future due to her neck and back problems. (Tr. 296).  Dr. Lee opined in January 2010 that plaintiff could not sit or stand for extended periods due to her spinal condition and she would be incapable of getting through an 8-hour workday even by alternating sitting and standing.  (Tr. 633-34).  Dr. Kejriwal opined in January 2007 that plaintiff was limited to standing 1-2 hours in an 8-hour day; she was limited to sitting 1-3 hours in an 8-hour day; she could not bend at the waist; and she was limited to no fine manipulation bilaterally, no pushing/pulling of arm controls on the left, and no repetitive movement of leg controls bilaterally.  (Tr. 292-93, 452-55).  In a letter dated September 19, 2007, Dr. Shubs concluded that plaintiff's "stress intolerance, volatile mood, impulsivity, chronic pain and difficulty coping with people" rendered her "unemployable." (Tr. 421).  In an assessment issued on January 7, 2010, Dr. Shubs opined that plaintiff had fair to no ability to perform certain job-related mental functions, depending on her pain and stress levels.  (Tr. 618-19).

The ALJ gave "little weight" to the opinions of plaintiff's treating psychiatrist, Dr. Shubs, (Tr. 15) and "very little weight" to the opinions of plaintiff's treating pain specialists, Dr. Choi and Dr. Lee, and to the opinion of plaintiff's primary care physician, Dr. Kejriwal.  (Tr. 21, 22). The ALJ determined that Dr. Shubs' conclusions were "somewhat contradictory;" they were not well-supported by his treatment records; they were inconsistent with the opinions of the other

15

treating, examining and evaluating sources; and they were inconsistent with "the weight of the medical evidence of record." (Tr. 22). The ALJ determined that the opinions of Dr. Choi and Dr. Lee were conclusory and were not well-supported by objective evidence of medically acceptable clinical findings or laboratory diagnostic techniques. (Tr. 21). The ALJ stated that both Dr. Choi and Dr. Lee failed to provide a function by function analysis and instead addressed the ultimate conclusion of disability, which is an area reserved to the Commissioner. (*Id.*). The ALJ further noted that Dr. Choi had indicated that plaintiff was going to look into working part-time, which the ALJ found to be "at least somewhat inconsistent with his conclusions." (Tr. 21-22). The ALJ found that Dr. Kejriwal's opinion was entitled to "very little weight" because he provided no explanation for his conclusions, his conclusions were not supported by his own treatment records, and his opinion was not consistent with the weight of the medical evidence of record. (*Id.*). The ALJ found that the limitations imposed by Dr. Kejriwal in his May 2009 assessment were "so extreme as to be unbelievable." (Tr. 21). The ALJ further determined there were no objective findings in the record to support the extensive limitations on standing, sitting, walking and stooping (no bending at the waist) Dr. Kejriwal imposed, and the limitations on plaintiff's use of her hands were not consistent with or supported by the record as a whole. (*Id.*). The ALJ determined that the "only plausible explanation for the rather pessimistic assessments of the claimant's functional capabilities provided by these treating physicians is that such assessments were based on "uncritical acceptance of the claimant's subjective complaints and allegations." (Tr. 22).

The ALJ's decision to give "very little weight" to the assessments of the physicians who treated plaintiff for her physical impairments and "little weight" to the assessment of the treating

16

psychiatrist is without substantial support in the record. It is well-established that the findings

and opinions of treating physicians are generally entitled to substantial weight, and if the

opinions are well-supported by medically acceptable clinical and laboratory diagnostic

techniques and uncontradicted by other substantial evidence, they are entitled to controlling

weight. *See Blakley,* 581 F.3d at 406; *Wilson,* 378 F.3d at 544; *Walters v. Comm'r of Soc. Sec.,*

127 F.3d 525, 529-530 (6th Cir. 1997). "[A] finding that a treating source medical opinion . . . is

not entitled to controlling weight [does] not [mean] that the opinion should be rejected." *Cole v.*

*Astrue,* 661 F.3d 931, 938 (6th Cir. 2011) (quoting *Blakley,* 581 F.3d at 408). When the ALJ

declines to give controlling weight to a treating physician's assessment, "the ALJ must still

determine how much weight is appropriate by considering a number of factors, including the

length of treatment relationship and the frequency of examination, the nature and extent of the

treatment relationship, supportability of the opinion, consistency of the opinion with the record as

a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406. *See also*

*Cole,* 661 F.3d at 937. In accordance with this rule, the ALJ must give "good reasons" for the

ultimate weight afforded the treating physician's opinion, based on the evidence in the record,

and the reasons must be sufficiently specific to enable meaningful review of the ALJ's decision.

*Blakley,* 581 F.3d at 406 (citing 20 C.F.R. § 404.1527(d)(2); Social Security Ruling 96-2p, 1996

WL 374188, at *5; *Wilson,* 378 F.3d at 544). The ALJ's failure to adequately explain the reasons

for the weight given a treating physician's opinion "*denotes a lack of substantial evidence,* even

where the conclusion of the ALJ may be justified based upon the record." *Blakley,* 581 F.3d at

407 (emphasis in the original and quoting *Rogers,* 486 F.3d at 243).

As an initial matter, the Court acknowledges that an ALJ is not required to accept a physician's conclusion that his patient is "unemployable." Whether a person is disabled within the meaning of the Social Security Act is an issue reserved to the Commissioner, and a treating physician's opinion that his patient is disabled is not "giv[en] any special significance." 20 C.F.R. § 404.1527(e). *See Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004) ("The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician.") (citation and brackets omitted).

Nevertheless, in this case, the ALJ failed to provide an adequate justification for failing to give controlling weight to the opinions of plaintiff's four treating physicians: Dr. Shubs, Dr. Choi, Dr. Lee and Dr. Kejriwal. *See Blakley,* 581 F.3d at 406; *Wilson,* 378 F.3d at 544; *Walters,* 127 F.3d at 529-530. First, although the ALJ determined that the opinion of the treating psychiatrist, Dr. Shubs, was inconsistent with "the weight of the medical evidence of record" and with the opinions of the other treating, examining and evaluating sources (Tr. 15, 22), the basis for the ALJ's determination in this regard is unclear. Dr. Shubs' assessment appears to be consistent with the opinion of the consultative examining psychologist, Dr. Fritsch, the only other mental health provider of record who treated or examined plaintiff. Dr. Fritsch determined that plaintiff has moderate to extreme impairments in certain areas of work-related mental function, including moderately to markedly impaired ability to maintain optimal concentration and persistence in the workplace; markedly impaired ability to remember and carry out detailed instructions; extremely impaired ability to remember and carry out complex instructions; and markedly impaired ability to respond appropriately to work pressures. (Tr. 239). Given the seeming consistency between the assessments of Dr. Shubs and Dr. Fritsch, the evidentiary basis

18

for the ALJ's determination that Dr. Shubs' opinion was inconsistent with the opinions of the other mental health sources is unclear.

Similarly, the basis for the ALJ's determination that the assessment of the treating physician, Dr. Kejriwal, was inconsistent with "the weight of the medical evidence of record" and with the opinions of the treating and examining sources (Tr. 22) is unclear.  In fact, Dr. Kejriwal's assessment that plaintiff was unable to perform even sedentary work appears to be consistent with the opinions of each of the treating pain management specialists, Dr. Lee and Dr. Choi, and with the opinion of the examining physician, Dr. Fritzhand.  Dr. Fritzhand opined in November 2008 that plaintiff appeared "incapable of performing even a mild amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects," and he concluded that plaintiff appeared "markedly impaired to the extent that she is incapable of performing remunerative employment."  (Tr. 438).  Although the ALJ determined that Dr. Fritzhand's assessment was likewise entitled to "very little weight" because his findings and conclusions were "inconsistent with the record as a whole" (Tr. 22), the ALJ failed to discuss the evidence in the record which purportedly supported this finding.  In light of the seemingly consistent opinions of the treating physicians and Dr. Fritzhand, and absent a sufficient explanation by the ALJ for his finding in this regard, the ALJ's reason for discounting Dr. Kejriwal's assessment lacks evidentiary support in the record.  *Blakley*, 581 F.3d at 407.

Second, although the ALJ determined that the treating physicians' assessments were not supported by medically acceptable clinical findings or laboratory diagnostic techniques, the ALJ failed to address the objective findings noted by Dr. Choi in his October 2007 letter (Tr. 296-

lumbar discopathy at L4-L5 and L5-S1 and central disc displacement at C5-6)[2]; by Dr. Lee in his January 2010 letter (Tr. 633-34-June 2006 lumbar MRI revealed significant degenerative disc disease at L4-5 and L5-S1, with disc protrusion at L5-S1 and bulge at L4-5; August 2006 cervical MRI revealed degenerative disc disease at C5-6 with displacement and ventral cord abutment and C3-4 degenerative joint disease/arthropathy, for which plaintiff was currently receiving cervical and lumbar epidural injections); and by Dr. Fritzhand in his report (MRI findings). (Tr. 434).

The only evidence which is seemingly contrary to the assessments of the treating physicians is from the consultative examining physician, Dr. Swedberg, who examined plaintiff on one occasion in October 2007 (Tr. 242-48); the non-examining state agency physician, Dr. Derrow, who reviewed the record that same month (Tr. 270-77); and Dr. Semmelman, the non-examining state agency psychololgist, who reviewed the record in June 2007. (Tr. 251-67). Dr. Derrow opined that plaintiff could occasionally lift/carry 50 pounds, she could stand walk and sit about 6 hours in an 8-hour workday, she could occasionally stoop, and her ability to push/pull was unlimited. (Tr. 271-72). Both Dr. Swedberg and Dr. Derrow opined that plaintiff's obesity did not contribute to her symptoms. (Tr. 244, 271). The ALJ gave Dr. Derrow's opinion "some weight" as "generally consistent with the medical evidence of record." (Tr. 22). The ALJ did not discuss whether Dr. Swedberg's opinion was entitled to any weight. The ALJ decided to give the opinion of Dr. Semmelman, who found that plaintiff had no more than moderate limitation in any work-related area of function (Tr. 261-268), "great weight." (Tr. 14).

Although the opinion of a state agency consultant may be entitled to greater weight than a treating or examining source medical opinion "[i]n appropriate circumstances," such as where the

---

[2]Dr. Choi recommended epidural steroid injections, which were eventually obtained. (Tr. 439-50; 521-59; 605-12).

consultant's opinion in based on a review of a complete case record, *see* Social Security Ruling 96-6p, such is not the case here.  The state agency physician, Dr. Derrow, offered his RFC opinion in October 2007, before the majority of the medical evidence was entered in the record. Therefore, this non-examiner's opinion was not based on a complete record, and does not provide substantial evidence for rejecting the treating source opinions or for the ALJ's RFC opinion. *See Blakley*, 581 F.3d at 409 ("we require some indication that the ALJ at least considered these facts before giving greater weight to an opinion that is not based on a review of a complete case record"). *See also Shelman*, 821 F.2d at 321; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).  In addition, the evidentiary basis for the ALJ's decision to give "some weight" to the opinion of Dr. Derrow is not clear.  (Tr. 22).  The ALJ determined that Dr. Derrow's opinion that plaintiff was capable of medium level work with no more than occasional stooping was "generally consistent with the medical evidence of record" but that the record supported "greater restrictions in the claimant's exertional limitations."  (*Id*.).  The ALJ failed to explain how Dr. Derrow's opinion was consistent with the medical evidence of record, in what ways it was inconsistent with the medical evidence of record, and what evidence in the record supported greater exertional limitations.

Similarly, the ALJ determined that non-examining state agency psychologist Dr. Semmelman's opinion was "consistent with medical evidence of record" and that she provided a "sufficient explanation for her opinions."  (Tr. 14).  The ALJ did not explain what medical evidence of record he was referencing in this regard.  In fact, Dr. Semmelman's findings appear to be inconsistent not only with those of the treating psychiatrist, Dr. Shubs, but also with those of the consultative examining psychologist, Dr. Fritsch.  Dr. Fritsch opined that plaintiff has

21

moderate to extreme impairments in certain areas of work-related mental function, including the ability to maintain optimal concentration and persistence in the workplace; the ability to remember and carry out detailed instructions; the ability to remember and carry out complex instructions; and the ability to respond appropriately to work pressures. (Tr. 239). Furthermore, as is the case with Dr. Derrow, Dr. Semmelman offered a mental RFC opinion in October 2007, before the majority of the medical evidence was entered in the record, including Dr. Shubs' records subsequent to that date. Therefore, this non-examiner's opinion was not based on a complete record and does not provide substantial evidence for rejecting the treating source opinion. *See Blakley*, 581 F.3d at 409; *Shelman*, 821 F.2d at 321; *Harris*, 756 F.2d at 435.

Nor does the ALJ's decision reflect that he analyzed all of the required regulatory factors which must be considered if the treating source opinions are not given controlling weight, which include the length of the treatment relationship, the nature and the extent of the treatment relationship, the supportability of the opinion, its consistency with the record as a whole, and the specialization of the treating source. *See* 20 C.F.R. § 404.1527(d)(2). Applying the requisite factors in this case, it appears that the treating physicians' assessments should have been afforded great weight and incorporated into plaintiff's RFC assessment.

Dr. Choi and Dr. Lee are specialists in the area of pain management. The record contain over three years worth of progress notes documenting plaintiff's regular course of treatment by these specialists. (Tr. 302-59, 374-76, 385-87, 397-402, 560-80, 623-25, 629-32). In addition to prescribing pain medication for plaintiff, Dr. Choi and Dr. Lee referred plaintiff for chiropractic treatment and to physical therapy, and they prescribed medication for her. Similarly, the record documents that plaintiff began individual mental health treatment with Dr. Shubs, a specialist in

the field of mental health, in October 2006. The record contains progress notes from a two-year period detailing plaintiff's sessions, her prescription history, and clinical assessments of plaintiff's mental health. (Tr. 422-433, 596-603). The Social Security regulations recognize the need for longitudinal evidence in a mental impairment case given that an individual's level of functioning may vary considerably over time. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (D)(2). (Tr. 618-19). However, in discounting Dr. Shubs' opinion, the ALJ relied on only those records indicating that plaintiff's level of functioning was adequate and disregarded those records where plaintiff's level of functioning was poor. The ALJ did not take the length of plaintiff's treatment and the fluctuations in her level of functioning over the course of her treatment into account as required by the Social Security regulations when determining the weight to give Dr. Shubs' opinion.

While the ALJ stated he gave "very little weight" to the opinions of Dr. Kejriwal, Dr. Choi and Dr. Lee and "little weight" to Dr. Shubs' opinion (Tr. 15, 21, 22), the ALJ's decision does not reflect the ALJ's analysis of the regulatory factors so as to enable this Court to meaningfully review the ALJ's conclusion. The Court cannot say that the treating physicians' opinions are "so patently deficient that the Commissioner could not possibly credit" them and therefore excuse the ALJ's failure in this case. *Wilson*, 378 F.3d at 547. Because the ALJ failed to consider the factors listed in 20 C.F.R. § 404.1527(d)(2) in determining the weight to give the treating physicians' opinions, the ALJ's rejection of the treating physicians' RFC assessments is not supported by substantial evidence. The ALJ's decision in this respect constitutes legal error warranting a reversal and remand of this case for reconsideration of plaintiff's RFC, including

proper analysis of the weight to be given the treating physicians' RFC assessments consistent
with the treating source regulation. 20 C.F.R. § 404.1527(d); *Wilson*, 378 F.3d at 546.

**(2)  The ALJ erred by failing to properly consider the effects of plaintiff's obesity.**

Plaintiff claims that the ALJ erred by failing to properly consider the effects of her
obesity in violation of Social Security Ruling 02-01p. The Commissioner argues that the ALJ
specifically considered and accounted for plaintiff's obesity by expressly finding that obesity
aggravated her symptoms and by limiting her to light work. (Doc. 14 at 12).

SSR 02-01p recognizes that obesity may affect an individual's ability to perform the
exertional functions of sitting, standing, walking, lifting, carrying, pushing, and pulling; it may
affect an individual's ability to perform postural functions such as climbing, balancing, stooping,
and crouching; it may affect the ability to manipulate due to the presence of adipose (fatty) tissue
in the hands and fingers; and it may affect the ability to tolerate extreme heat, humidity, or
hazards. SSR 02-01p provides as follows:

> An assessment should also be made of the effect obesity has upon the individual's
> ability to perform routine movement and necessary physical activity within the
> work environment. Individuals with obesity may have problems with the ability
> to sustain a function over time. As explained in SSR 96-8p . . . our RFC
> assessments must consider an individual's maximum remaining ability to do
> sustained work activities in an ordinary work setting on a regular and continuing
> basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week,
> or an equivalent work schedule. In cases involving obesity, fatigue may affect the
> individual's physical and mental ability to sustain work activity . . . .
> The combined effects of obesity with other impairments may be greater than
> might be expected without obesity. For example, someone with obesity and
> arthritis affecting a weight-bearing joint may have more pain and limitation than
> might be expected from the arthritis alone.

Here, the ALJ stated that he took the impact of plaintiff's obesity into account as required
by SSR 02-01p by making the following finding:

24

In accordance with SSR 02-1p, I have considered the impact obesity has on limitation of function, including the claimant's ability to perform routine movement and necessary physical activity within the work environment. Symptoms of the claimant's impairments were aggravated by obesity at [a] height of approximately 63 inches and weight of approximately 283 pounds (See Exhibit 4F).

(Tr. 12). However, the ALJ did not explain the meaning of his finding by discussing how plaintiff's obesity impacted her symptoms. Furthermore, the ALJ stated that he relied on Dr. Swedberg's assessment in support of his determination that at a height of 63 inches and a weight of approximately 283 pounds, plaintiff's obesity did aggravate her symptoms. (Tr. 12, citing Exh. 4F-Tr. 241-249). Yet, Dr. Swedberg expressly gave the opposite opinion in his assessment, stating: "Obesity *does not* contribute to symptoms, although weight reduction would obviously be beneficial." (Tr. 244) (emphasis added). Given the apparent contradiction between the ALJ's determination that plaintiff's obesity aggravates her symptoms and Dr. Swedberg's opinion that it does not, coupled with the ALJ's failure to cite any other medical evidence to show how plaintiff's obesity impacts her RFC, it is impossible to determine whether the ALJ adequately factored the impact of plaintiff's obesity on her symptoms into his RFC assessment. Because Dr. Kejriwal and Dr. Fritzhand were in agreement that plaintiff's obesity contributed to her symptoms (Tr. 437, 453), remand for consideration of the specific manner in which plaintiff's obesity impacts her RFC is warranted.

### 3. Plaintiff's remaining assignments of error should be sustained.

Plaintiff alleges as her last three assignments of error that the ALJ erred by (1) improperly substituting his opinion for that of plaintiff's treating physicians; (2) making selective references to the record to support a finding that plaintiff was not disabled; and (3) posing an improper hypothetical to the VE which did not accurately reflect the weight of the medical evidence as a

25

whole because it was not supported by the opinions of the four treating physicians. Assignments of error three and four allege, in essence, that the ALJ failed to give sufficient weight to the opinions of the treating physicians and that the error was not harmless. As the Court has addressed these errors in connection with plaintiff's first two assignments of error, assignments of error three and four should be sustained.

With respect to the fifth assignment of error, plaintiff argues that the ALJ relied upon a flawed hypothetical question propounded to the VE in examining the vocational aspects of this case. As explained above, the ALJ's RFC assessment ignores the limitations provided by plaintiff's treating physicians and is not supported by substantial evidence. Thus, the hypothetical question propounded by the ALJ suffers from the same deficiencies as the RFC assessment. Accordingly, the ALJ erred by relying on this vocational testimony to carry his burden at Step 5 of the sequential evaluation process. *See White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 789 (6th Cir. 2009) (ALJ erred in relying on answer to hypothetical question because it simply restated residual functional capacity which did not accurately portray claimant's physical impairments). Because the ALJ's hypothetical question failed to accurately portray plaintiff's impairments and limitations, the vocational expert's testimony in response thereto does not constitute substantial evidence that plaintiff could perform the work identified by the VE. Therefore, plaintiff's fifth assignment of error should be sustained.

### E. This matter should be reversed and remanded for further proceedings.

This matter should be remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation. All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's

entitlement to benefits as of her alleged onset date. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).  This matter should be remanded for reconsideration of plaintiff's RFC and the weight to afford plaintiff's treating physicians and vocational considerations consistent with this Report and Recommendation.

### IT IS THEREFORE RECOMMENDED THAT:

This case be REVERSED and REMANDED for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: 1/5/2012

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CHERYL SAWYERS,                           Case No. 1:11-cv-0025
      Plaintiff                              Spiegel, J.
                                             Litkovitz, M.J.

    vs

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant

### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).